NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0329n.06

Case No. 25-5557

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 22, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| PORTIER Q. GOVAN, | ) | |
|     Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: BATCHELDER, MOORE, and THAPAR, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** In 2025, a jury convicted Portier Govan on multiple counts related to sex trafficking, one count of obstruction, and one count of unlawfully possessing a firearm. The district court sentenced him to a total term of 300 months' imprisonment. Govan now appeals, challenging the sufficiency of the evidence for his convictions for conspiracy to commit sex trafficking; sex trafficking by force, fraud, and coercion; and interstate transportation for prostitution. Because the government presented sufficient evidence to support these convictions, we **AFFIRM.**

**I.**

In the months leading up to August 2022, Portier Govan and Brittany Howard stayed at a Ramada Inn in Bowling Green, Kentucky, out of which they ran a commercial sex operation. Govan had met Howard the previous September and had begun an intimate relationship with her. As an integral part of that relationship, Govan taught her about the prostitution business and proposed that she begin selling sex to other men. In her words, "[her] role was basically just to

make the money, and his role was to collect the money." R. 183, PageID 2462. Govan would direct Howard to set up the transactions, set prices for her, and collect the money afterward. Along with teaching her the mechanics of the sex industry, he showed her videos of him engaging in violence, including a video of Govan shooting at his own wife and another video of Govan and other men tying a man to a chair and beating him while pointing firearms at him. In relation to the second video, Govan warned Howard that "[t]his is what happens when you switch up on the mafia." *Id.*, PageID 2468. Govan also procured a copy of Robert Greene's *The 48 Laws of Power* and demanded that Howard copy into her personal journal passages from the book, including such maxims as:

- "Never outshine the master. Make the master appear more brilliant, and you will attain the heights of power."

- "Conceal your intentions by talking endlessly about your desires and goals. You appear friendly, open, and trusting."

- "Get others to do work for you but always take the credit. Use the wisdom, knowledge, and legwork of others to further your own cause."

- "Make other people come to you. Use bait if necessary. Lure him with fabulous gains, then attack. You hold all the cards."

- "Learn to keep people dependent on you. To maintain your independence, you must always be needed and wanted. The more you are relied on, the more freedom you have."

*Id.*, PageID 2515–16.

In August 2022, Govan began discussing his ploy to make more money by roping another woman into the operation. On August 11, he saw his opportunity: an 18-year-old woman with the initials C.C. who happened to patronize the gas station next to the Ramada Inn. Govan introduced himself and Howard and asked C.C. if she wanted to smoke marijuana with him in her car. The three smoked before leaving for Govan's and Howard's hotel room, where they began drinking

alcohol and having sex. Afterward, Howard and C.C. went to the Ramada Inn pool, where Howard explained her source of income to C.C. before attempting to sell sex to a man at the pool. But after Howard escorted him and C.C. back to her hotel room, the man could not pay, so Govan sent him away. C.C., who was intoxicated, spent the night with Govan and Howard.

The following day, Govan and Howard proposed that the trio drive in C.C.'s car to Nashville, Tennessee, where they could go shopping and have Howard's and C.C.'s nails manicured. The purpose of this trip was "to show out for" C.C. and convince her that, if she engaged in prostitution, "this is what [she was] going to be doing all the time." *Id.*, PageID 2477. Govan also continued to show romantic interest in her. After purchasing provocative clothing for the women, Govan drove them back to the Ramada Inn in Kentucky. On their way back, Howard attempted to procure more customers but came up short. So, Govan proposed that he photograph the women in their newly purchased provocative clothing so that he could include the images in a new sex advertisement.

Back at the Ramada Inn, Govan and Howard encouraged C.C. to have sex for money. Govan and Howard explained the "rules" of prostitution, and C.C. observed and briefly participated in Howard's next transaction. C.C. remained with Govan and Howard for another night.

On C.C.'s third day with Howard and Govan, her situation deteriorated rapidly. As Govan continued to show more affection for C.C., Howard grew jealous and began arguing with him. Govan began treating C.C. more aggressively, too. Govan photographed the women as he had planned the previous night, and Howard posted them in an advertisement for a "two girl special." *Id.*, PageID 2555. The trio went to a local store, where they encountered C.C.'s former boyfriend. After Govan announced that C.C. was "on [his] time now," her former boyfriend deduced C.C.'s

situation and urged her to leave with him. *Id.*, PageID 2372. Govan left in C.C.'s car to retrieve his gun, and the former boyfriend left the scene. After Govan returned in C.C.'s car, he demanded that she sit next to him in the passenger seat and give him her cell phone. As the trio drove away, Govan yelled at C.C, threatened her, announced his intention to kill her former boyfriend, and pointed his firearm at her head. He fired a shot at the passenger-side door at close enough range to C.C. that she had difficulty hearing afterward.

Govan drove the trio back to the Ramada Inn, repeatedly yelling with Howard, "[w]e all we got," and asking C.C. to join in the refrain. *Id.*, PageID 2388–89. Govan showed C.C. the beating video that he had previously shown Howard and demanded C.C.'s loyalty. He then took C.C. to a stairwell, "put his hand on the back of [her] head," and "pushed [her] head down towards" his genitals so that she could perform a sex act on him. *Id.*, PageID 2394. C.C. testified that she did not want to do so, but she feared what would happen if she resisted. C.C. tried to escape the Ramada Inn, but Govan had her car keys and cell phone, and he and Howard accompanied her whenever she attempted to go elsewhere.

Howard arranged another sex transaction, and, interpreting Howard's handling of a firearm while with the customer as a tacit threat, C.C. had sex with the customer against her will. C.C. accompanied Howard on another prostitution call and, again acting out of fear, allowed Howard to perform sex acts on her in front of a customer. Howard then arranged a third transaction, during which the customer groped C.C., who again permitted it out of fear.

On C.C.'s fourth and final day with Govan and Howard, C.C.'s former boyfriend and police officers arrived at the Ramada Inn. C.C. recounted her experience with Govan and Howard to a police officer, and the police arrested them.

Govan was charged with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594(c); sex trafficking by force, fraud, and coercion in violation of 18 U.S.C. §§ 2, 1591(a)(1), (b)(1), and 1594(a); obstruction of a sex-trafficking prosecution in violation of 18 U.S.C. § 1591(d); interstate transportation for prostitution in violation of 18 U.S.C. § 2421(a); and unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At trial, the jury heard testimony from Howard, C.C., a police detective who spoke with C.C. at the Ramada Inn, and a police detective who investigated the case. During its case, the defense briefly questioned one of the government's police witnesses before resting. The jury convicted Govan on all counts. Govan now challenges the sufficiency of the evidence for his convictions for sex trafficking conspiracy; sex trafficking by force, fraud, and coercion; and interstate transportation for prostitution.

## II.

"We review a challenge to the sufficiency of the evidence in a criminal case de novo." *United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023) (citation omitted). "In doing so, we ask 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citation omitted). "All reasonable inferences must be made to support the jury verdict." *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022) (citation omitted). "[W]e cannot 'reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury.'" *Id.* (second alteration in original) (citation omitted). "Circumstantial evidence alone is sufficient to sustain a conviction[,] and such evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (citation omitted). Before this court, Govan "bears a very heavy burden." *See id.* (citation omitted).

**A.**

Govan first challenges his sex-trafficking and conspiracy convictions. To prove the crime of sex trafficking, the government had to prove (1) that Govan "knowingly . . . recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], . . . [or] maintain[ed]" C.C.; (2) that Govan did so "knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . .[,] or any combination of such means w[ould] be used to cause [C.C.] to engage in a commercial sex act"; and (3) that the offense was committed "in or affecting interstate or foreign commerce." 18 U.S.C. § 1591(a). Alternatively, the government had to prove that he aided or abetted another in committing the crime. *Id.* § 2. "The term 'coercion' means . . . (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." *Id.* § 1591(e)(2). "The term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(5).

To prove the crime of sex-trafficking conspiracy, the government had to prove "that (1) there was an agreement to violate 18 U.S.C. § 1591, (2) [Govan] had knowledge of the essential objectives of the conspiracy, and (3) [Govan] knowingly and voluntarily joined the conspiracy intending to advance its objectives." *See United States v. Aldridge*, 98 F.4th 787, 794 (6th Cir. 2024).

Govan challenges only one element shared by both counts: whether the government presented sufficient evidence of fraud, force, or coercion. Even a cursory review of the record satisfies our sufficiency-of-the-evidence review. The jury heard that over the course of C.C.'s third day with Govan and Howard, Govan took C.C.'s car keys and cell phone, held a gun to her head, shot at the passenger-side door of her car while she sat in the passenger seat, pointed a gun at Howard, demanded that C.C. disclose her former boyfriend's address so that he could kill him, showed her a video of Govan and other men viciously beating an unknown man, demanded her loyalty, and "pushed [her] head" toward his exposed genitals. The jury also heard that C.C. tried to leave, but Govan and Howard conspicuously accompanied her whenever she attempted to go elsewhere.

C.C. testified that, after all of this, she no longer wanted to be with Govan and Howard, but she felt compelled into having sex with one of Howard's customers. And as if the preceding circumstances were not enough, the jury heard that Howard was handling a firearm—which C.C. interpreted as a tacit threat—when C.C. acceded to the commercial sex. While Howard remembered this incident differently, we "must resolve all 'evidentiary conflicts or credibility disputes' in the light most favorable to the jury's guilty verdict." *United States v. Reynolds*, 86 F.4th 332, 338 (6th Cir. 2023) (citation omitted). C.C. then allowed Howard to perform sex acts on her in front of another customer and permitted a third customer to grope her genitals, both times out of fear.

We find no merit in Govan's counterarguments. He points to parts of the record in which C.C. expressed an interest in him and prostitution, but that initial interest understandably waned after he pointed a gun at her head and fired it right in front of her. And his remaining arguments essentially ask us to ignore certain parts of the record or credit some pieces of evidence over others.

7

This we cannot do. Based on the evidence presented at trial, the jury reasonably found sufficient evidence of fraud, force, or coercion, and Govan's challenge to the sex-trafficking and conspiracy counts therefore fails.

**B.**

Govan also challenges the sufficiency of the evidence supporting his conviction for interstate transportation for prostitution. To convict him on this count, the government had to prove that he knowingly transported C.C. in interstate commerce with the intent that she engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. *See* 18 U.S.C. § 2421(a).

Govan contends that there is insufficient evidence to support the intent requirement, arguing that the trip from Tennessee to Kentucky was not primarily for the purpose of C.C.'s engaging in prostitution. We cannot agree. We recently explained the contours of the § 2421 intent element in *United States v. Deakins*, 152 F.4th 693 (6th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 510 (Apr. 20, 2026). There, we acknowledged that the Supreme Court had interpreted the original Mann Act—the "forerunner to the modern § 2421"—to require proof "that the defendant's improper purpose" was "the '*dominant* motive of such interstate movement.'" *Id.* at 705–06 (quoting *Mortensen v. United States*, 322 U.S. 369, 374 (1944)); *see also Helwig v. United States*, 162 F.2d 837, 839 (6th Cir. 1947) ("The [*Mortensen* C]ourt has . . . adopted the view that to sustain conviction the dominant motive of the interstate journey must be the fulfillment of the purposes condemned by the statute."). But we later "clarified that the government need not prove that sexual conduct was the *sole* purpose of the interstate transportation. . . . Rather, we stated that '[i]t is sufficient if prostitution was only *one of* the dominant purposes.'" *Deakins*, 152 F.4th at 706 (footnote omitted) (internal citation omitted) (quoting *United States v. Salter*, 346 F.2d 509, 511

(6th Cir. 1965)). The *Deakins* court further questioned, but did not decide, whether it could interpret *Mortenson*'s original pronouncement as merely dicta, or whether Congress' post-*Mortenson* amendment to the Mann Act's mens rea requirement (from "for the purpose" to "with intent") lessened the government's burden. *Id.*

Regardless of whether the government must prove that prostitution was "one of the dominant purposes" or a less significant purpose, the jury heard sufficient evidence to support the conviction. Howard testified that, prior to meeting C.C., Govan had planned to "bring along another female" as "a way . . . to make more money." R. 183, PageID 2469. Govan introduced himself and Howard to C.C. by using their prostitution aliases: "Yayo" and "Za Za." *Id.*, PageID 2472. After she and Govan acquainted themselves with C.C., Howard told C.C. about her source of income, told C.C. that she could make money from prostitution, and even had C.C. observe a sex transaction (albeit an unsuccessful one). The jury could reasonably infer that Govan and Howard were trying to bring C.C. into their commercial-sex scheme.

After that first day together, Govan drove Howard and C.C. to Nashville, where he gave them money to shop for clothes and pay for manicures. While no commercial sex occurred in Tennessee, Howard testified that Govan "really wanted to show out for . . . her" and demonstrate that "this [wa]s the life" she could expect if she joined their operation. *Id.*, PageID 2477. Even the clothing articles themselves related to drawing C.C. into commercial sex: The jury heard that Govan bought C.C. provocative attire that she wore during the "two girl special" photoshoot in Kentucky the following day. During the drive from Nashville to the Ramada Inn, Howard executed on her and Govan's "plan" to schedule commercial sex transactions in Kentucky for herself and C.C. *Id.*, PageID 2537. Shortly after the trio's arrival at the Ramada Inn, Govan and Howard began explicitly encouraging C.C. to have sex for money, which she soon did. Govan

later made clear that his feelings toward C.C. were far from loving:  C.C. testified that when he was confronted with C.C.'s former boyfriend, Govan responded that "she [was] on [his] time now," which made her realize that she "was just working for him."  *Id.*, PageID 2372. "[R]eviewing the evidence in the light most favorable to the prosecution," *Anderson*, 67 F.4th 768 (citation omitted), we cannot say that Govan's conviction is supported by insufficient evidence. Based on these facts, the jury reasonably concluded that Govan's dominant motive in transporting C.C. from Nashville to Kentucky was for her to engage in prostitution in Kentucky.

Govan's counterargument—that his driving C.C. and Howard to Nashville was merely "to do shopping, eat and get their nails done" and that "[t]he only purpose for traveling from Tennessee to Kentucky was to return back to [the] state in which both of them permanently resided"—does not pass muster.  Far from the "innocent vacation trip [that] in no way related to the practice of their commercial vice" contemplated in *Mortensen*, 322 U.S. at 377, Govan's interstate transportation of C.C. can reasonably be interpreted as a recruiting mission.  So, even presuming that there was no "change in the purpose of the trip during its course" and viewing the "round trip as a whole," *id.* at 375, a reasonable juror could conclude that Govan's intent—even one of his dominant purposes—was to have C.C. engage in prostitution as part of his newly expanded venture.

**III.**

We affirm.

10